May it please the court, my name is Sarah Gannett and I represent the appellant Ian Greenstein in this matter. I'd like to reserve two minutes for rebuttal without his permission. Could you raise the mic just a little bit please? Yes. Thank you. Is that better? Yes. I wanted to know should I assume from the court's comments earlier that the court would like me to focus on the identification? That is correct. Very well. Mr. Greenstein moved to suppress the identification in this case because it was based on two unduly suggestive procedures. First, a single photograph that was either shown to the officer or that the officer came upon depending on which version of facts the court believes. And second, a appropriately admitted in this case because there was insufficient evidence of the reliability of those identifications. The officer who had reported first to the scene where the three men were gathered gave a description of the suspect who was purportedly Mr. Greenstein that consisted solely of a description of his clothing. There was no description of his height or build, any physical characteristics, any facial characteristics, any hairstyle, anything other than the clothing that the officer allegedly observed. And without any of those corroborative details, it was inappropriate for the district court to find this identification unreliable. The district court relied on the facts of the chase that the officer purportedly got close enough to the individual to see his face. Is your point that Walsh looked at a photograph that was sort of left conveniently for him or handed to him of Goldstein? It depends on which version of the facts the court accepts. The district court found that the photograph was on the detective's desk. And yes, our position would be that it was left there when the detective knew that police officers who had responded in this case would be coming to the office to provide reports and evidence. Even if I were to agree, and I think your position is that that was highly suggestive. Yes. Even if I were to agree with that, how was there a prospect of misidentification given Walsh's having seen the person that he chased a number of times while he was chasing him? And then secondly, given the cellblock identification that he made? Well, to answer the second part first, it's our position that the cellblock identification is tainted by the single photo identification, which occurred prior to the cellblock identification. Might that not have been a result of his having seen Goldstein while he was chasing? That would be an answer to the first part of the court's question, which is what about the fact that the officer claimed to have seen Greenstein while he was chasing him? If the officer really seen Mr. Greenstein as he was chasing him, he would have provided a more detailed description than the one he gave. And it's not as if he had only one opportunity to give a description. He was interviewed by the detective who was investigating and on whose desk he found the photograph conveniently on the night of the offense. And he gave no further details other than the clothing description. He was then re-interviewed following the identification of the photograph. And during that interview, he gave no details about the physical characteristics of Mr. Greenstein. And to the degree that the government wants to rely on the fact that here we have a police witness and so there's less likely to be any suggestibility involved, I think equally here we have a police witness. And police are trained to make these identifications and they're trained to file reports and file descriptions that will permit a jury to rely on those identifications at trial. And he provided nothing other than a clothing description, which was obvious from the videotape of the event itself. On the substantial risk of misidentification standard, we do look at the entire record, don't we? We do. So that we can consider the identification of Goldstein as having been one of the persons at the pizzeria who robbed the pizzeria with green jacket and red gloves? Well, there was no identification of Mr. Greenstein as being one of the persons at the pizzeria. There were no identifications made at the pizzeria. Let me clarify. There was a video. There was a video. It showed two persons. It did. As they were robbing the pizzeria. It did. And there's no question that Officer Walsh chased a person who was wearing the same kind of clothing as the person who was seen in the pizzeria that night. However, there's no indication that that testified that he started about 30 feet away from Mr. Greenstein. He came at some point within 10 feet or so, but they were climbing up and over fences. The officer testified that Mr. Greenstein looked down at him from the fence and said, Oh my God. And so he got a close look at Mr. Greenstein's face. And, but he didn't provide any description of Mr. Greenstein or Mr. Greenstein's face. Well, that's not, that's not necessarily fatal. I'm saying that's not necessarily fatal to his identification. It's not necessarily fatal. If he in fact did see him and he, he said pretty definitely that he got a good look at him. He said that he got a good look at him, but the record doesn't prove that up because there, there's, he gave a description and he gave a description that was clothing only. And it's just incredible that a police officer, trained officer would give a description like that. On the other hand, the officer did say that, uh, you know, during the chase, they were going up and over fences that he was sometimes dim, sometimes light, but he was at least 10 feet away from Mr. Greenstein. And that, um, he claimed he wasn't concerned about the gun in this case because Mr. Greenstein couldn't have been holding it and climbing up over fences. And yet the officer testified that he couldn't radio a specific description to other officers because he was holding a gun as he climbed over the fences. And shortly after the, well, shortly after the chase, Greenstein ended up in Zebrzewski's sister's apartment, the apartment of a co-defendant in the case. Isn't that one of the factors that the jury can take into account along with all the others to conclude that the state has got the right person? Well, the jury certainly could consider that fact, but without the identification by Mr. Walsh. Could the district court consider that? I think not. I think the district court has to consider what was available up to the point that those identifications were made. And there was no knowledge on the part of Mr. Walsh that that occurred. And in fact, to consider that would be sort of like saying, well, they ended up getting the right guy, so there must not have been a suggestible and unreliable identification. What is your strongest point that the government has the wrong person? The strongest point that the government has the wrong person is that there's almost no other evidence corroborating his participation in this offense. There's the identification of Mr. Walsh. There's his presence at the apartment of Mr. Zebrzewski. And then there's her recanted testimony about her identification of his voice. The other evidence that's submitted is the very prejudicial evidence that he was identified from a police photograph and that he was arrested with a weapon, and that's how he came into police custody. The jury heard both of those things. What about the sister of Zebrzewski? She testified that he was at her apartment or house that night, but although the government cross-examined her on a prior statement that she recognized his voice, she recanted that testimony at trial. And then she said... What about, did she view the video? I believe she did view the video. And did she identify him from the video? I don't think anyone was identified from the video other than by that voice identification, which she then recanted at trial. If the court looks at the video, which is Government's Exhibit 2 and is part of the record, the court will see it's impossible to tell who these people are because they're wearing so much clothing over their faces. When Tracy saw Goldstein, didn't she see him as wearing clothes similar to the person that she identified in the video taken during the robbery? She saw him wearing a large white t-shirt and, I believe, blue jeans. And her testimony at trial was that... And white sneakers. Pardon me? And white sneakers. And I believe her testimony at trial, which I think is absolutely correct, is that that's a get-up that lots of people in this area wear. And it's not necessarily dispositive. Had he been wearing that green shirt and had he had on the gloves and all of those other items, then that might be a different issue. Good. Ms. Gannett, thank you very much. Thank you. Mr. Enda? Thank you. May it please the Court, William Innan for the Government. On the issue of the identification and whether it was, first of all, suggestive and second, reliable, there's unrebutted testimony from Officer Walsh, as Judge Shiles recognized, that he was able to see Ian Greenstein's face as he chased him, as he jumped over these fences on several different occasions during a chase that lasted the course of over a block and a half through areas that were well lit by both street lights and lights in the backyards of the houses and in the yards through which they were running. Within a couple of hours of that chase, Tracey Zagrebski has called the police, or in this case actually, Tracey Zagrebski's boyfriend called the police after Ian Greenstein showed up at Tracey Zagrebski's house the night of the robbery. She had seen the video five or six times prior to Greenstein coming to her house. She immediately recognized Ian Greenstein. She immediately recognized that he was wearing the same clothes as the person in the robber. And in her statement that she gave to the police, she said she could also recognize from his voice that it was the same voice as the person who had been in the video and had committed the robbery. And she recanted that though, right? She did. She recanted that, Your Honor. Did the government impeach her with her prior inconsistent statement on that? The government did, Your Honor. The jury got to hear what she first said and what she later said. That's correct, Your Honor. And even perhaps more importantly though, Your Honor, with respect to the issue of reliability and suggestivity, what that identification did was trigger the detective, the assigned detective, Detective Aiken, to investigate this person, Ian Greenstein, and caused him to then look at Ian Greenstein and have this photograph of Ian Greenstein on his desk, which one can infer logically is a reasonable thing to have happened. He hears that Greenstein is the guy that did the robbery. He pulls his photo. The photo happens to be on the desk. Officer Walsh, who's doing paperwork related to the robbery itself, comes up to drop something off and sees Greenstein on the desk and says, hey, that's the guy that I chased. There is nothing suggestive about an identification that occurs by happenstance. Well, on the issue of suggestivity, the defendant's point was that the photograph of Greenstein was either handed to Police Officer Walsh or it was conveniently left on a detective's desk. Judge Giles never really made a ruling on the suggestibility of the photograph. Was that error for him to fail to do that? In this circumstance, I would not say that it was an error. There was a lot of information that the District Court gave in terms of making its decision on this issue. Wasn't that the very essence of the proceeding, to determine whether the identification was suggestible or not? Well, what the District Court essentially did was say, that's a question for the jury to decide. So I would submit that there's an implication in the District Court's ruling that there's evidence going both ways here. I'm not in a position to decide one way or the other. That's something that the jury should decide. In any event, in terms of the reliability, there's nothing to suggest that this was not a reliable identification. So under the Third Circuit standards, under the biggest factors, this is an identification that certainly does not violate the defendant's due process rights and can come into evidence. So while it may have been nice to have had a little bit more information from the District Court, I would not say it was an error. Now, there's also a logical inconsistency in the argument that the defense is making here. They're saying that there wasn't enough, that Officer Walsh didn't have a good enough opportunity to identify Ian Greenstein from the flight that took place on the night of the robbery. What was his initial communication about what he saw? What was initial identification of Greenstein? Initially, it was essentially the same as what he broadcast on the flash, which was the clothing description of the person who he had been chasing. But he didn't say, I saw his face, he's white, African-American, he has any ethnic identification? He did not. And although the defense has made the point that he was interviewed, I would submit to the court that the record doesn't suggest that he was interviewed. There may have been a brief exchange with the detective, but essentially this was, you know, again within a couple of hours of the robbery, different officers, different detectives have different assignments that they need to do during that period. Officer Walsh is focusing on completing the paperwork that he needs to complete. This is not a situation, for example, where there are civilian witnesses and a detective sits down and takes a detailed statement. So what was the information? White male, that's it? Essentially, it was the flash information again. Officer Walsh testified that he would have been able to provide a more detailed description. By the time that became relevant or would have been, would have become relevant in this instance, your honor, Ian Greenstein had already been identified first by Tracy Zagrebski as one of the robbers, and second by Officer Walsh by the photograph that was on his, on the detective's desk when Officer Walsh saw it. If I may, your honor, the defense is saying that Officer Walsh couldn't have identified him based upon the chase and having seen his face as he was hopping over these fences. And then they're saying, despite that, that when he sees this picture on the detective's desk very briefly, that based upon just seeing that photograph for however short period of time he sees it, several days later he's able to identify Ian Greenstein at seeing him in the cell block at just a random occasion. Well, there's an inconsistency there, a logical flaw that undermines the entire defense argument. Essentially, if they're saying that Officer Walsh has such a good memory that based upon just seeing a photograph of Ian Greenstein, not even a full body shot, but just his face, that several days later based on seeing that photograph, he's able to identify him in the cell room. Well, that supports that Officer Walsh has an excellent memory and an excellent recall. Walsh's initial statement was that the I wouldn't quite go that far, Your Honor. His initial statement was that Detective Aitken showed me the photo. I would submit that... Well, how is that different? If I give you a photograph, here is Greenstein. Isn't that saying this is the guy you're looking for? Well, there's a certain amount of semantic argument here that can be done. Having somebody hand me the photo and say, is this the guy? Is it different from he showed me the photo, which is open to various interpretations, which is what the district court found. And again, I would submit that based on the ambiguity of the initial statement combined with Officer Walsh's testimony, not just at the motion to suppress, but also at the preliminary hearing, which was only a month and a half after the robbery, as well as that trial, that he had randomly seen this photograph, that supports Officer Walsh's conclusion. And the district court's conclusion that Officer Walsh, that that is in fact what happened. But getting back to my other point, Officer Walsh is now able to identify Greenstein, not just from the photograph, but seeing him live and in person. So it makes far more sense that his ability to identify Greenstein several days after the robbery is, again, based on his having chased him, his having seen the way he moves, his having seen his face during the course of the chase, and not from this brief momentary glimpse at a photograph at the detective division immediately following the robbery. Although, again, I submit that that was also a reliable identification. I'm not sure if the court has any other questions on this point. I know the court hasn't asked specifically any questions about the physical restraint issue. I would submit to the court that there is a very compelling video that was entered into the evidence as Exhibit 2 in this case. It hasn't been submitted to the court as part of the appellate record. However, I did make copies of that video on CD that I would like to give the court so that it has an opportunity to review them following argument, if it wishes. Do you think the, it is an interesting point. You think the restraint occurred because he directed the employees or customers to stay under a counter, or was it because he told them to go back and go into the freezer? I think it was actually both in this case, Your Honor. And the court can see from the video, which the district court had an opportunity to watch on. They never got to the freezer. They escaped. That's correct, Your Honor. You've essentially asked two questions. I'm happy to break it down, although I don't have a lot of time. One can see from the video that as soon as the robbers come in, one of the robbers, Ian Greenstein, grabs a customer who's standing at the front of the store, literally grabs him, pulls him underneath the counter, which is about 10 feet away, pulls him toward the counter. We want to have you on tape as well, so don't stray too far from the microphone. I'm sorry, Your Honor. Literally grabs him, pulls him, and places him underneath the counter, and then goes back and gets Sherry Greenstein, who's in a back room hiding underneath of a table, and drags her also underneath the counter. There's not a physical touching here. He says, get out from under there, takes her, puts her underneath the counter, and holds both of them there as well as a driver at gunpoint while his compatriot, Alan French, is behind the counter taking the money from Harry Zissio's, taking the money from the cash register. Clearly, that is facilitating the robbery because he's occupying these two people. He's prevented Sherry from perhaps dialing 911 on her cell phone. He's clearly restraining them. It's clearly in an effort to facilitate the robbery. Then, the robbers then heard all of the people, the six people who were inside, tell them to get into the freezer. Now, the fact that they don't go into the freezer, they're still being restrained in this back room, which is, of course, a separate area from the room that they have been in where they've actually taken the money from. Regardless of how restrained in that area, the fact that the door is not locked, that they are able to escape, doesn't mitigate or doesn't eliminate the fact that there is an initial restraint, just as in Copenhaver had the victim in that case simply pushed aside the screen after 10 seconds instead of waiting the 15 to 30 minutes. Well, they had the threat of force behind all this. I'm sorry? In other words, the threat of force. Yes, clearly. It's clear from the video that the guns are drawn. Just to pursue that a little bit more, but is the threat of force the restraint or is the threat of force part of the robbery? It's both here. But if it's both, why should he get a bump up in the sentence? I mean, you're only sentenced for one conduct. Well, Your Honor, it goes back sort of to the point that the defendant is trying to make by citing the Anglin case. And in Anglin, the robbers ordered the victims to go to the ground. The both ordering and additional movement that the robbers are imposing upon the victims. And here, we actually have a physical grabbing of at least Stephen Davis when Ian Greenstein takes him, physically takes him and pulls him and puts him under the counter, which is obviously distinguishable from Anglin and that line of cases. Thank you. Mr. Inden, thank you very much. Thank you. Good. Ms. Cannon, anything you want to tell us? Yes, you may give them to the clerk, please. The flaw that the government attempts to create out of the defense argument is simply not a flaw. What happened is in the calm aftermath of this event, the officer was shown by his own sworn statements or conveniently found on the detective's desk a photograph of Mr. Greenstein. And there's nothing in the record to indicate that he had only a momentary opportunity to view that photograph. In fact, he's been interviewed about that photograph. And so it makes perfect sense that from that photograph, he would then be able to identify Mr. Greenstein in the cell block. There's simply no inconsistency there. The inconsistency is between the fact that he supposedly had this chase of Mr. Greenstein, where he was 10 to 30 feet away. The record is a little different, I would submit, than what the government suggested, that the lighting was sometimes dim, sometimes good. He went up and over the fences. He focused on the hands of the suspect first, and then he claimed to focus on the face. But he never provided any information about the face. Everything that you just said sounds like you're telling us that you don't believe that Walsh was credible when he said that he saw Greenstein during the chase. That is part of what I'm saying. But what I'm also saying is that he did not... Whose function is that? Is that your function? Is that our function? Or is that the jury's function? Or the finder of facts function? Well, this court could certainly find that the district judge's fact-finding was clearly erroneous. But I think this also goes to... But it seems that that fact-finding is based upon the trial judge saying, I believe Officer Walsh when he testified that he saw Greenstein the night of the chase. I think that is what the district court decided. What evidence in the record undermines that? Well, the evidence that he never gave any description of Mr. Greenstein. And the government's repeated reference to the flash is really a cover for the fact that all go to the credibility determination and the clearly erroneous finding. It goes to the reliability of the identification. Because one of the Neal versus Biggers factors is the accuracy of the prior description. And here, there essentially is no prior description other than the clothing description. And that... Are you asking for a bright line rule that when somebody's in hot pursuit and they call in a description, they must describe the facial characteristics in addition to the clothing of the person they're pursuing? I don't think it's a bright line rule, Your Honor. But here we had not only the hot pursuit and the opportunity to give the flash. We had an interview after the chase that night. And then we had a subsequent interview a day or days later. So this officer had the opportunity to give whatever description this officer wanted to give. He didn't have one. And that is the, according to social science and the case law, the most important Biggers factor, the accuracy of the prior description. The opportunity to observe, the timing, all of these other factors are relevant as well. But it's hard to give much credit to the opportunity to observe when there is not only an inaccurate description. There is no description whatsoever to weigh against this adjustable procedures. I know my time is up. I don't know if the court wanted me to address physical restraints. Thank you very much, Ms. Gannett. The case was very well argued. We will take the matter under advisement.